**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| | : | **Criminal Case:  1:20-cr-38 (RDM)** |
| **v.** | : | |
| | : | |
| | : | |
| **ROGER HEDGPETH II,** | : | |
| | : | |
| | : | |
| **Defendant.** | : | |

**Government's Memorandum in Aid of Sentencing**

On February 8, 2020, in the middle of the afternoon, the defendant approached a uniformed officer of the United States Secret Service (USSS), who was stationed near the White House grounds, at 15th Street NW and Pennsylvania Avenue NW.  As the defendant approached the officer, he stated words to the effect of, "I am here to kill President Donald Trump," and when asked how he planned to do that, the defendant told the USSS officer that he had a knife.  The defendant did in fact have a knife—along with an empty pistol holster—on his person at the time he approached the officer.  Although the defendant was taken into custody without incident, he (along with any tourists, residents, and workers near the location of the incident) is quite lucky that his armed approach of the USSS officer did not escalate any further.

When asked in a subsequent interview about his statement about wanting to kill the President and having a knife, the defendant stated that he only wanted to get the officer's attention. When asked if he would try to hurt the President or any U.S. Secret Service protectee, the defendant said only if the Holy Spirit told him to, and he continued that the Holy Spirit only tells him to hurt bad people.

The government recognizes that the evidence available in this case points to the defendant's actions being driven by mental illness, which was unchecked in February 2020, but which the defendant appears currently able to manage with the help of medication and close supervision. Accordingly, the government asks the Court to sentence the defendant to three years of probation, with conditions including but not limited to mental health treatment, as contemplated by the parties in the plea agreement, which will allow the defendant an opportunity to continue to demonstrate to the Court that he can continue to manage his mental illness, but which will also allow the Court to revoke his probation and sentence him to incarceration, should he be unable to comply with the conditions of probation.

## PROCEDURAL HISTORY

The defendant was arrested on February 8, 2020, and he made his initial appearance before a Magistrate Judge in the District of Columbia on February 10, 2020.  At that hearing, the government moved for the defendant's detention pending trial and for an initial competency screening.  The Magistrate granted the government's motion for an initial competency screen and set the case for a detention hearing.[1]  That initial screen found that the defendant was incompetent to stand trial.  The government moved to have the defendant committed to the custody of the Attorney General for a 30-day competency evaluation, and that motion was granted on March 13, 2020.  Following that evaluation, a doctor employed by the Bureau of Prisons found the defendant competent to stand trial, and the Magistrate entered a finding of competence on June 20, 2020.

On July 14, 2020, the Court ordered the defendant released into the third-party custody of his mother, to reside with her in Florida, and it imposed several conditions of release, including

---

[1]      After a few continuances of that hearing, the Magistrate granted the government's motion to detain the defendant pending trial on March 13, 2020.

that the defendant comply with mental health treatment.  Since his release, the defendant has largely complied with his conditions, and reports indicate that the mental-health treatment the defendant is undergoing has had a positive effect.  On June 2, 2021, the defendant entered a plea of guilty to Counts Two and Three in the Superseding Information, charging him with possession of a prohibited weapon and treats, in violation of D.C. Code §§ 22-4514(b) & 22-407.

## DETERMINING THE SENTENCE

This Court must sentence the defendant consistently with the factors described in 18 U.S.C. § 3553(a).  When weighing the § 3553(a) factors as part of its calculus of an appropriate sentence, the Court should consider not only the nature and circumstances of the offense and the history and characteristics of the defendant, but also the applicable sentencing objectives—they are, that the sentence: (1) reflect the seriousness of the offense; (2) promote respect for the law; (3) provide just punishment; (4) afford adequate deterrence; (5) protect the public; and (6) effectively provide the defendant with needed educational or vocational training and medical care.  *See* 18 U.S.C. § 3553(a)(1) and (2).  In addition, the sentence should reflect "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."  18 U.S.C. § 3553(a)(6).

There is no Guideline range for the two D.C. Code misdemeanors to which the defendant has entered a guilty plea, as the D.C. Voluntary Sentencing Guidelines do not specify a range for misdemeanors.  *See* Draft PSR ¶ 61.[2]

A.   **Statutory Penalties**

The defendant faces a maximum sentence of one year of imprisonment and a fine of not

---

[2]    The government cites to the draft PSR throughout this memorandum because there is not yet a finalized PSR available as of the filing of this memorandum.

more than $2,500 for his violation of Count 2 of the Superseding Information.  D.C. Code §§ 22-4514(b) & 22-3571.01(b)(5); *see also* Draft PSR at ¶¶ 59, 73.  The defendant faces a maximum sentence of six months' imprisonment and/or a fine of not more than $1,000 for his violation of Count 3 of the Superseding Information.  D.C. Code §§ 22-407 & 22-3571.01(b)(4); *see also* Draft PSR at ¶¶ 60, 74.  There is no provision in the D.C. Code allowing the imposition of supervised release for a misdemeanor conviction.  *See* D.C. Code § 24-403.01 (establishing supervised release for felonies committed after August 5, 2000); *see also* Draft PSR ¶ 65.  The Court may suspend the imposition of sentence, or any portion thereof, and place the defendant on probation for a term not to exceed five years, including any extensions of probation.  *See* D.C. Code § 16-710.

C.  **Analysis of Factors Enunciated in 18 U.S.C. § 3553(a)**

As discussed in detail below, an analysis of the factors enunciated in 18 U.S.C. § 3553(a) demonstrates that the imposition of a suspended sentence, with three years of probation, and conditions of that probation to include mental health treatment, orders to stay away from the White House and Mar-a-Lago, and that the defendant cooperate with USSS, as laid out in more detail in the plea agreement, ECF No. 44 at ¶¶ 5.a to 5.e., is appropriate under the circumstances.[3]

1.  **The Nature and Circumstances of the Offense**

The defendant's conduct on February 8, 2020 was serious.  A grand jury returned an indictment alleging that the defendant violated 18 U.S.C. § 871 by threatening to kill, kidnap, or harm the President of the United States.  According to the Draft PSR, the defendant would have faced an advisory Guidelines range on that count of up to 60 months' imprisonment.  Draft PSR at ¶ 63.  The defendant moreover agrees that charged violation of 18 U.S.C. § 871 was based in fact.  Plea Agreement, ECF No. 44, at ¶ 3.  The defendant has received a substantial benefit from

---

[3]     A map showing the requested Stay Away area surrounding the White House is attached hereto as Exhibit 1.

the plea agreement offered by the United States.

The specific actions the defendant took on February 8, 2020, also put the public at grave risk of harm, even the Court assumes *arguendo* that he would not have been able to make good on his threat to kill the President.  While armed with a knife, and while wearing an empty pistol holster that could create the impression that he was armed with a firearm, the defendant approached a Secret Service officer near the White House in the middle of the day and with numerous people around, and he told the Secret Service officer that he was there to kill the President. In so doing, he created a very real danger. Thankfully no one was harmed by law enforcement's response to the defendant's actions, but it is not hard to imagine the situation unfolding differently if the Secret Service officer had seen the holster and believed it to contain a gun or if the defendant had made some sort of movement that the officer thought was a threat. All the innocent people in the area were potentially at risk if the defendant's interaction with the Secret Service had escalated.  Indeed, as Magistrate Judge Harvey found in deciding to detain the defendant pretrial, the defendant's actions "plainly created a material risk of harm to himself and to others in the immediate area." ECF No. 16 at 5-6.

## 2.    The History and Characteristics of the Offender

The defendant's history and characteristics cut both ways in this case, but in the government's view they ultimately support the sentence that the government requests here and that the defendant does not oppose—a lengthy period (three years) of probation, with stringent requirements that the defendant comply with mental health treatment, along with the other conditions enumerated in ¶ 5.a through 5.e of the plea agreement.  *See* ECF No. 44 at 2-3.

The defendant's lack of a criminal history and his military service weigh in his favor, but the defendant's behavior in the months leading up to February 2020 is concerning.  Although the

government will not recount the details in a public filing, we direct the Court's attention specifically to the information contained in ¶¶ 36-39 of the Draft PSR.  The government's concern regarding the defendant's dangerousness has, from this case's inception, been tied to the defendant's willingness and ability to receive mental-health treatment.  *See* Gov. Mem. In Support of Pretrial Detention, ECF No. 7 at 4 ("The government has reached out to defense counsel to note that it would be willing to explore some sort option that involved mental-health treatment in an inpatient or residential facility if that facility could also satisfy the government's concerns about risk of flight and community safety").  The records recounted in the PSR underscore that the government's concern as to the risk he poses if he does not comply with treatment is well founded.

That said, the defendant has been in near-perfect compliance with stringent conditions of release, including that he comply with mental health treatment, since his release following the competency diagnosis in July 2020.  That treatment regimen appears to be working.  *See* Draft PSR at ¶ 42.  The lack of any significant violation of the defendant's conditions of release in over a year provides further evidence that the current regimen is working.

The defendant's ability to maintain a mental-health treatment regimen and comply with stringent conditions of release for over a year tips this factor in favor of the probationary sentence recommended by the parties, even in light of the seriousness of the defendant's conduct.

### 3. The Need to Promote Respect for the Law, to Provide Just Punishment, to Afford Adequate Deterrence, and to Protect the Public

Sentencing the defendant to a term of probation with stringent conditions, including mental health treatment, will serve the governmental interest in providing a just punishment that sufficiently deters others and protects the public. The defendant's actions here were dangerous for the reasons stated above, but he has already served over five months' incarceration while he was litigating detention and then awaiting the outcome of his competency examination.  He has been

under the third-party custodianship of his mother for over a year and, if the Court imposes the government's requested sentence, he will be required to demonstrate that he can continue complying with mental health treatment (and other conditions) for an additional three years before he will be rid of supervision.

The sentence proposed by the government recognizes that the defendant has already served time in this case, that he entered a plea of guilty, and that it is in both his interests and society's interests that he continue to receive mental health treatment that appears to be working.

### 4.    The Need to Provide the Defendant with Educational or Vocational Training

The defendant has no need for additional educational or vocational training.

### 5.    The Need to Avoid Unwarranted Sentencing Disparities Among Defendants with Similar Records who Have Been Found Guilty of Similar Conduct

A suspended sentence on two misdemeanor charges is well within the range contemplated by the D.C. Voluntary Sentencing Guidelines.  Although those Guidelines do not specify a range for misdemeanors, "short split" sentences are authorized for classes of crimes up to and including Assault with a Dangerous Weapon, Robbery (unarmed), and Second-Degree Child Sex Abuse for offenders with no criminal history.  *See* D.C. Voluntary Sentencing Guidelines, Appendix A – Master Grid.  Straight probationary sentences are permissible for classes of crimes up to and including Second-Degree Burglary and Negligent Homicide for offenders with no criminal history. *See id.*

The length of probation requested by the government here—to which the defendant does not object—is warranted by the need to ensure that the defendant can remain compliant with his treatment for a long period of time to mitigate the danger he poses when he is not compliant with treatment, as demonstrated by his actions on February 8 and recounted in the PSR as described

7

above.

## CONCLUSION

For the foregoing reasons, and any additional reasons as may be cited at the sentencing hearing in this matter, the government respectfully requests that the Court sentence the defendant to one year of incarceration on Count Two, six months of incarceration on Count Three, with execution of that sentence suspended as to all but time served.  The government also requests that the Court place the defendant on probation for a term of three years and that it impose the conditions of probation specified in ¶¶ 5.a-5.e of the plea agreement.


Respectfully submitted,

CHANNING D. PHILLIPS
ACTING UNITED STATES ATTORNEY
D.C. Bar Number 415793

By:_____/s/ *Erik M. Kenerson*_
ERIK M. KENERSON
Assistant United States Attorney
Ohio Bar Number 82960
United States Attorney's Office
555 Fourth Street, N.W.
Washington, D.C.  20530
Telephone: 202-252-7201
Erik.Kenerson@usdoj.gov